## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ALPHA MEDIA GROUP, INC., | Case No. 23-10881 (CTG) |
| Debtor. | |
| ALFRED T. GIULIANO, solely in his capacity as the Chapter 7 Trustee of the estate of Alpha Media Group, Inc., | |
| Plaintiff, | Adv. Proc. No. 25-_____ (CTG) |
| -against- | |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | |
| Defendants. | |

## COMPLAINT

Alfred T. Giuliano, not individually but solely in his capacity as the Chapter 7 Trustee ("Plaintiff") of the bankruptcy estate (the "Estate") of Alpha Media Group, Inc. (the "Debtor"), by and through his undersigned counsel, files this Complaint against defendants American Express Company and American Express Travel Related Services Company, Inc. (together, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.     By this Complaint, Plaintiff seeks to avoid and recover prepetition transfers the Debtor made to Defendants.  The transfers paid charges on American Express credit cards issued to the Debtor's former CEO and his company.  The amounts the Debtor paid included not less than

$471,104.43 in personal charges of the CEO that served no legitimate business purpose, provided no value to the Debtor, and defrauded the Estate and creditors.

2.       In addition, Plaintiff seeks to avoid and recover as preferential transfers not less than $3,518,491.42 in transfers the Debtor made to Defendants during the 90-day period prior to the Petition Date.  That amount includes at least $483,000 in transfers that the CEO caused the Debtor to make to Defendants at or about the time that the CEO resigned, which resulted in the depletion of the Debtor's remaining assets.

3.       Plaintiff brings this action pursuant to Part VII of the Federal Rules of Bankruptcy Procedure, on behalf of the Debtor, its Estate, and/or creditors, seeking the entry of a judgment, among other things: (i) avoiding and recovering the transfers set forth on <u>Exhibits B, C, and D</u> to this Complaint (collectively, the "Avoidable Transfers") made by the Debtor to or for the benefit of one or both of the Defendants as actual intent fraudulent transfers, constructive fraudulent transfers, or preferential transfers pursuant to 11 U.S.C. §§ 547, 548, 550; (ii) in the alternative, compelling Defendants to disgorge the amounts by which they were unjustly enriched; and (iii) granting Plaintiff such other and further relief as may be just and proper.

## JURISDICTION AND VENUE

4.       Subject matter jurisdiction over this adversary proceeding exists pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the Amended Standing Order of Reference of the United States District Court for the District of Delaware, dated February 29, 2012.

5.       Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a) and (c).  This adversary proceeding is related to the above-captioned bankruptcy case pending before this Court under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").

6.     The predicates for the relief sought herein include sections 105(a), 323, 547, 548, 550, and 704 of the Bankruptcy Code, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable state law.

7.     Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry of final orders or judgments by a bankruptcy judge.

8.     The District of Delaware has personal jurisdiction over each of the Defendants under Bankruptcy Rule 7004 and/or other applicable law.  In addition, each of the Defendants had multiple, meaningful contacts in the State of Delaware relative to business activities and transactions which they availed themselves of and which directly and adversely affected the Debtor and its creditors.

## PARTIES

9.     Plaintiff Alfred T. Giuliano is the duly qualified and appointed Chapter 7 Trustee of the Estate.

10.     The Debtor is a corporation formed under the laws of the State of Delaware.

11.     Defendant American Express Company is a New York corporation that, among other things, issues "American Express" branded credit cards through one or more of its subsidiaries.

12.     Defendant American Express Travel Related Services Company, Inc. is a New York corporation that, upon information and belief, issues "American Express" branded credit cards.  Upon further information and belief, American Express Travel Related Services Company, Inc. is wholly owned and controlled by Defendant American Express Company.

13.     Defendants' principal place of business is 200 Vesey Street, New York, New York 10285.

14.     Defendants' registered agent for service of process in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 198101.

## FACTS COMMON TO ALL COUNTS

15.     Prior to the Petition Date (defined below), the Debtor operated an online travel booking business under names such as "Booking Vault," "FlightGuru," and "Alpha Flight Guru."

16.     As a company operating in the travel industry, the Debtor's business was significantly impacted by the COVID-19 pandemic and related travel restrictions.

17.     The Debtor suffered a liquidity crisis and by late March 2020 the Debtor had nearly run out of cash.

18.     The Debtor sought and obtained funding from various sources.

19.     On or about March 31, 2020, the Grace Czimarik 1998 Charitable Remainder Unitrust, established August 19, 1998 ("CRT") made loans to the CEO's company and two other stockholders for the purpose of supporting the Debtor's business.  The loans totaled approximately $800,000.

20.     On or about May 13, 2020, the Debtor obtained a $500,000 loan from the United States Small Business Administration ("SBA").

21.     On or about April 13, 2021, the Debtor obtained a $1,000,000 loan from CRT.

22.     These debts remain unpaid as of the Petition Date.

23.     In addition, the Debtor used certain credit cards to provide cash flow to operate its business.

24.     These included: (i) an American Express Business Platinum credit card account ending 5-33004 or 5-38006 (the "Primary Amex Card"), and (ii) an American Express Bonvoy Brilliant credit card account ending 8-33009 or 8-36002 (the "Amex Bonvoy Card" and, together with the Primary Amex Card, the "Credit Cards") issued by one or both of the Defendants.

25.     The Credit Cards were issued to Vladimir Myasnyankin (the "CEO"), a co-founder of the Debtor and the Chief Executive Officer and a director of the Debtor at all times relevant to this Complaint, and/or to VDM Group, Inc. ("VDM"), an entity wholly owned by the CEO.

## The CEO Diverts the Debtor's Money

26.     Upon information and belief, between 2020 and in or about May 2022, the Debtor paid VDM directly for the use of the Credit Cards.

27.     The Credit Card statements throughout this period reflect both business expenditures and personal charges.

28.     Beginning in or about May 2022, the Debtor made payments directly to Defendants. It appears that the first such payment was made on or about May 16, 2022.

29.     From and after May 16, 2022 through mid-June 2023, the Debtor made all or substantially all of the payments for the Credit Cards directly to Defendants, including, without limitation, not less than $1,416,238.52 in transfers to Defendants on account of the Amex Bonvoy Card, as reflected on Exhibit A to this Complaint.

30.     Defendants knew that these payments were made by the Debtor and not by either of the named cardholders.

31.     A significant portion of the Debtor's transfers to Defendants with respect to the Credit Cards satisfied the CEO's personal charges and expenditures (collectively, the "Personal Charges")

32.     The Person Charges on the Amex Bonvoy Card are set forth on Exhibit B to this Complaint and total not less than **$471,104.43**.

33.     As set forth more fully on Exhibit B to this Complaint, the Personal Charges included, among many other things, art, designer clothes, expensive meals, furniture, a home

entertainment system, appliances, pool maintenance, vacations, and numerous expenditures in Marin County, California, where the CEO resides.

34.     The Personal Charges were not legitimate business expenses of the Debtor.

35.     Defendants knew or should have known that the Personal Charges were not legitimate business expenses of the Debtor.

36.     Even while the Debtor was paying the Credit Cards directly (both business expenses and the Personal Charges), the Debtor continued to make transfers directly to VDM.

37.     There is no written agreement between the Debtor and either the CEO or VDM regarding the Debtor's payment of the Personal Charges.

38.     There is no basis in the Debtor's books and records for the Debtor's payment of the Personal Charges.

39.     The Debtor's board of directors did not authorize the Debtor to pay the Personal Charges.

**Stockholders and Creditors Demand Information**

40.     In the second half of 2022 and continuing into 2023, various stockholders and creditors of the Debtor were seeking financial statements and other information about the Debtor's business and financial affairs.

41.     At all times relevant to this Complaint, the CEO and the Debtor's employees acting at his direction and under his control failed to maintain complete and accurate financial records for the Debtor.

42.     For example, on November 1, 2022, the Debtor's chief financial officer ("CFO"), responded to an email from the Debtor's controller ("Controller"), and the CFO stated in relevant

part, "I am still concerned that we are overstating profits beyond this glitch however as we should have a lot more cash than we actually have."

43.    In another email on February 6, 2023 from the CEO to the Controller, the CFO stated, in part, "I am concerned that we are still showing excessive profit compared to reality."

44.    In an email dated February 24, 2023, the CFO stated in relevant part:

"The Balance Sheet is still off by +/- $1 million with the non existent credit card processor deposits.  The fact that we are not generating surplus cash also says to me that we are overstating profitability and have been since the beginning of 2022.  My sense is that once the fictitious deposit is eliminated and inventory corrected that we will be close to breakeven for last year at best.

"One way or another, we need to fix the QB numbers asap. We can't report to CBC, Montage, Delaware or the Feds until we do so.  Please make this a priority."

45.    In another email dated March 16, 2023, the CFO advised the CEO that the CFO believed the Debtor had "overstated GP [gross profits] by roughly $100k monthly for the last 14 months.  The adjustment, if nothing else is found, will reduce the 2022 net income to close to zero."  The CFO also emphasized to the CEO that "we are losing money both on a cash and book basis and need to stem the bleeding."

46.    In a further email dated March 29, 2023, the CFO relayed to the CEO a conversation the CFO had with one of the Debtor's other directors and that the director was "clearly suspicious" of the Debtor's transactions with VDM, and the CFO acknowledged the failure to maintain records regarding the Debtor's transactions with VDM, which would have included the Debtor's payments to Defendants that satisfied the CEO's and VDM's personal obligations for the Credit Cards.

## The 90 Day Transfers

47.    After late-March 2023, the Debtor's financial position deteriorated rapidly.  A significant, if not the only, driver of this was the transfers to or for the benefit of the CEO and VDM, including the Debtor's ongoing payments to Defendants for the Credit Cards.

48.     During the 90-day period prior to the Petition Date, that is between April 1, 2023 and June 30, 2023, the Debtor made transfers of the Debtor's interest in property to or for the benefit of Defendants through payments of cash and other credits totaling not less than **$3,518,491.42** (collectively, the "90 Day Transfers"), which are set forth in detail on Exhibit C to this Complaint.

49.     During this period, the Debtor's primary checking account was overdrawn numerous times.

50.     The situation became so serious that, on May 30, 2023, VDM transferred $153,000—a fraction of the money it had received from the Debtor—back to the Debtor's account.

51.     On June 12, 2023, the CEO sent the Debtor's CFO a number of invoices on behalf of VDM totaling approximately $3,052,912.22.

52.     Also on June 12, 2023, the CFO sent the Controller an email that stated in relevant part:

> "No doubt you are aware of the legal pressure that has arisen to produce complete and timely books and records of AMG.  Any shareholder is entitled under Delaware law and we are being pushed pretty hard.
>
> "I have today processed several detailed invoices supplied by [the CEO].  These have been charged to A/P and **the previous entries creating a loan by VDM have been eliminated as there was no Board approval under the By-Laws for a loan**."  (emphasis added)

53.     As reflected in the CFO's email, the Debtor's employees, acting under the CEO's direction, were scrambling to try to justify the Debtor's transfers to or for the benefit of the CEO and VDM, which would have included the Debtor's transfers to Defendants that satisfied the CEO's and VDM's personal obligations for the Credit Cards.

54.     The CEO's invoices referred to above do not appear to be genuine for a number of reasons, including (i) there is no written agreement between the Debtor and either the CEO or

VDM regarding the transfers, (ii) there is no basis in the Debtor's books and records for the amounts asserted, and (iii) there was no Board authorization or approval for the Debtor to incur these alleged debts to a related party.

55.     One day later, on June 13, 2023, the CEO announced his resignation.

56.     During the two-day period between June 13-14, 2023, the CEO caused the Debtor to make certain transfers, including transfers to Defendants totaling not less than **$483,000.00** (collectively, the "June 13-14 Transfers").

57.     The June 13-14 Transfers, which satisfied the CEO's and VDM's personal obligations for the Credit Cards, are set forth on Exhibit D to this Complaint.

58.     The transfers that the CEO caused the Debtor to make at or about the time of his resignation, including the June 13-14 Transfers to Defendants, represented substantially all of the Debtor's cash.

59.     On June 14, 2024, the Debtor's remaining directors contacted the Debtor's bank advising them that the recent transfers, including the June 13-14 Transfers, were "not authorized and need to be halted immediately."  However, they were not able to halt or reverse those transfers.

60.     Also, on or about June 13-14, 2023, the CEO and others transferred or misappropriated the Debtor's proprietary software used to operate its online travel business.

**The Bankruptcy**

61.     On June 30, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

62.     On or about July 3, 2023, Alfred T. Giuliano was appointed as the Chapter 7 Trustee.

63.     The meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was held and concluded on July 26, 2023.

64.     Non-insider creditors have asserted approximately $3 million in unpaid claims against the Estate.

**<u>Insolvency</u>**

65.     At all times relevant to this Complaint, the Debtor was insolvent.

66.     As stated above, by March 2020, the Debtor was unable to pay its debts as they became due.

67.     In response, the Debtor incurred not less than $1.5 million in debts between March 2020 and April 2021.  Those debts remain unpaid as of the Petition Date.

68.     The Debtor's chief financial officer stated that the Debtor had significantly overstated its assets, gross profit, and income and that its 2022 net income was "close to zero."

69.     By April 2023, the Debtor's account was becoming overdrawn, primarily if not solely because of the transfers being made to or for the benefit of the CEO and VDM, and including the Avoidable Transfers made to Defendants.

70.     By May 30, 2023, the Debtor was in a liquidity crisis and was cash flow insolvent to such an extent that VDM transferred back to the Debtor a small portion of the funds that had been misappropriated from the Debtor.

71.     A similar, but smaller, situation occurred in the midst of CEO's resignation.  As one of the CEO's final acts, he caused the Debtor to make, among other things, the June 13-14 Transfers to Defendants.  Those transfers, together with other transfers made for the benefit of the CEO, stripped the Debtor's account of funds to such a degree that VDM had to transfer $2,000 back to the Debtor's account because it once again had become overdrawn.

72.     In addition, the CEO and an entity controlled by the CEO's father have asserted that the Debtor owes them, collectively, an additional $6.2 million, portions of which date back to 2018.  If those alleged debts are valid, that would mean at all times relevant to this Complaint, the Debtor would have been not just insolvent but deeply insolvent.

### FIRST COUNT – ACTUAL FRAUDULENT TRANSFERS
### Pursuant to 11 U.S.C. § 548(a)(1)(A)

73.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

74.     A trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the petition date with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted on or after the date such transfer was made or such obligation was incurred.

75.     As set forth in detail in this Complaint, Plaintiff seeks to avoid the transfers the Debtor made within two (2) years prior to the Petition Date with actual intent to hinder, delay or defraud creditors (collectively, the "Actual Fraudulent Transfers") and to recover the value thereof from Defendants.

76.     The Actual Fraudulent Transfers include, without limitation, the following:

    a.     Not less than **$471,104.43** in transfers made by the Debtor to Defendants in payment of the Personal Charges on the Amex Bonvoy Card, as reflect on Exhibit B to this Complaint; and

    b.     Not less than **$483,000.00** in transfers made by the Debtor to Defendants at or about the time that the CEO resigned, as reflected on Exhibit D to this Complaint.

77.     Each Actual Fraudulent Transfer was a "transfer" within the meaning of 11 U.S.C. § 101(54).

78.     Each Actual Fraudulent Transfer was made within two (2) years prior to the Petition Date.

79.     Each Actual Fraudulent Transfer was a transfer of property, or of an interest in property, of the Debtor to and/or for the benefit of the above-named Defendants.

80.     Each Actual Fraudulent Transfer was made with actual intent to hinder, delay, or defraud the Debtor's Estate and its creditors.  As set forth in detail in this Complaint, there are numerous badges of fraud and facts supporting a direct inference of actual intent to hinder, delay, and defraud the Debtor's Estate and its creditors, including, without limitation, the following:

    c.    The Actual Fraudulent Transfers were made for the benefit of the CEO and VDM, each of whom is an insider of the Debtor.

    d.    The Actual Fraudulent Transfers were concealed.  Among other things:

        i.    The CEO and others acting at his direction and under his control withheld documents and information that would have revealed such transfers.

        ii.    The Debtor's directors and employees appear to have had no knowledge of them.

        iii.    The documents purportedly justifying the Actual Fraudulent Transfers were not presented to the Debtor until June 2023, even though they purportedly related to periods from 2018 through 2023.

    e.    The Actual Fraudulent Transfers were made after demands had been made for the Debtor's financial statements and information.

    f.    The Actual Fraudulent Transfers were made at a time when there was a live dispute regarding what, if any, obligations the Debtor owed to the CEO or VDM, who are the named cardholders of the Credit Cards.

    g.    There was no board approval for any of the Actual Fraudulent Transfers. On the contrary, when the Debtor's directors learned about the Actual Fraudulent Transfers, they attempted to prevent them.

    h.    The Debtor did not receive any value, let alone reasonably equivalent value, for any of the Actual Fraudulent Transfers.

    i.    The Debtor was insolvent at the time Each Actual Fraudulent Transfer was made.

81.     Defendants did not take any of the Actual Fraudulent Transfers in good faith. Among other things, as set forth in this Complaint, Defendants knew the Actual Fraudulent Transfers were made by the Debtor, which was not the named cardholder.  And Defendants knew or should have known the Personal Charges were personal expenditures of the CEO and not legitimate business expenses of the Debtor.

82.     Therefore, the Actual Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

### SECOND COUNT – CONSTRUCTIVE FRAUDULENT TRANSFERS
### Pursuant to 11 U.S.C. § 548(a)(1)(B)

83.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

84.     A trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the petition date if (i) the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation and (ii) (w) the debtor was insolvent or became insolvent as a result of such transfer, (x) the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital, (y)  the debtor intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured, or (z) the debtor made such transfer to or for the benefit of an insider, or incurred for the benefit of an insider, under an employment contract and not in the ordinary course of business.

85.     During the two-year period prior to the Petition Date, the Debtor made one or more transfers (the "Constructive Fraudulent Transfers") to or for the benefit of one of more of the Defendants, including, without limitation, the following:

a.      Not less than **$471,104.43** in transfers made by the Debtor to Defendants in payment of the Personal Charges on the Amex Bonvoy Card, as reflect on Exhibit B to this Complaint; and

b.      Not less than **$483,000.00** in transfers made by the Debtor to Defendants at or about the time that the CEO resigned, as reflected on Exhibit D to this Complaint.

86.     Each of the Constructive Fraudulent Transfers was a "transfer" within the meaning of 11 U.S.C. § 101(54).

87.     Each of the Constructive Fraudulent Transfers was made within two (2) years prior to the Petition Date.

88.     Each of the Constructive Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtor to and/or for the benefit of the above-named Defendants.

89.     As set forth in detail in this Complaint, each of the Constructive Fraudulent Transfers was made at a time when either the Debtor was insolvent or became insolvent as a result of such transfer, was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital, and/or the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

90.     The Debtor did not receive a reasonably equivalent value in exchange for any of the Constructive Fraudulent Transfers.  Among other things, (i) no agreement between the parties or other legal basis exists that obligates the Debtor to make such transfers and (ii) the Personal Charges were solely for the CEO's personal benefit and not for any legitimate business purpose of the Debtor.

91.     Defendants did not take any of the Constructive Fraudulent Transfers in good faith. Among other things, as set forth in this Complaint, Defendants knew the Constructive Fraudulent Transfers were made by the Debtor, which was not the named cardholder.  And Defendants knew

or should have known the Personal Charges were personal expenditures of the CEO and not legitimate business expenses of the Debtor.

92.     Therefore, the Constructive Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

### THIRD COUNT – PREFERENTIAL TRANSFERS
#### Pursuant to 11 U.S.C. § 547

93.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

94.     During the ninety (90) day prior to the Petition Date (the "Preference Period"), the Debtor made one or more transfers (collectively, the "Preferential Transfers") to or for the benefit of one or both of the Defendants totaling not less than $3,518,491.42, as reflected on Exhibit C to this Complaint.

95.     Each Preferential Transfers was made by the Debtor and constituted a transfer of an interest in property of the Debtor.

96.     Each Preferential Transfers was to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because each Preferential Transfers either reduced or fully satisfied a debt or debts then owed by the Debtor to or for the benefit of Defendants.

97.     Each Preferential Transfers was made for, or on account of, an antecedent debt owed by the Debtor to Defendants before such Preferential Transfers was made.

98.     As set forth in this Complaint, during the Preference Period, the Credit Cards were used to pay business expenses of the Debtor.

99.     Each Preferential Transfers was made while the Debtor was insolvent in that the sum of its debts was greater than all of its property at a fair valuation at the time each such transfer was made.  The Debtor's insolvency prior to and during the Preference Period is set forth in detail

above.  Further, Plaintiff is entitled to the presumption of the Debtor's insolvency during the Preference Period pursuant to 11 U.S.C. § 547(f).

100.    Each Preferential Transfers was made either on or within 90 days before the Petition Date.

101.    As a result of each Preferential Transfers, Defendants received more than they would have received (i) through this chapter 7 case; (ii) if the Preferential Transfers had not been made; and (iii) if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

102.    In accordance with the foregoing, each Preferential Transfers is avoidable pursuant to 11 U.S.C. § 547(b).

103.    Prior to Plaintiff filing this Complaint, Plaintiff performed a reasonable due diligence in the circumstances of this case and took into account the reasonably knowable affirmative defenses that may be available to Defendants.  Among other things, Plaintiff conducted a review of the Debtor's books and records to determine whether certain prepetition transfers qualified as preferential transfers.  Plaintiff and his advisors also reviewed all reasonably available information, including documents produced by third parties and any documents or information produced by Defendants.  Based upon that reasonable due diligence, Plaintiff has determined that he may avoid the Preferential Transfers, or a portion thereof, even after consideration of any defenses that may be available to Defendants under section 547(c) the Bankruptcy Code.

104.    Pursuant to section 547(g), Defendants bear the ultimate burden of proof on any affirmative defense to the Preferential Transfers.  Plaintiff does not concede the validity of any defense, reserves all rights in connection therewith, and leaves the Defendants to their burden.

105.    Therefore, the Preferential Transfers are avoidable pursuant to 11 U.S.C. § 547(b).

## FOURTH COUNT – RECOVERY OF AVOIDABLE TRANSFERS
### Pursuant to 11 U.S.C. § 550

106.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

107.    As set forth in detail in this Complaint, including on Exhibits B, C, and D hereto, the Debtor made one or more Avoidable Transfers to or for the benefit of each Defendant.

108.    Defendants are the initial transferees, or the immediate, mediate, or subsequent transferee, of one or more of the Avoidable Transfers.

109.    Plaintiff may recover, and intends to recover, the Avoidable Transfers and benefits therefrom from any and all mediate, intermediate, or subsequent transferees.

110.    Accordingly, Plaintiff is entitled to avoid and recover the Avoidable Transfers from the Defendants pursuant to pursuant to 11 U.S.C. § 550.

## FIFTH COUNT – UNJUST ENRICHMENT

111.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

112.    In the alternative, Plaintiff asserts claims for unjust enrichment against Defendants.

113.    As set forth in this Complaint, Defendants were enriched and received economic benefits without justification as a result of the Avoidable Transfers set forth in detail in this Complaint, including the Exhibits hereto.

114.    Defendants have unjustly retained the sums and the property received by each of them to the detriment of the Debtor's Estate and its creditors.

115.    The Debtor was impoverished as a result of the Avoidable Transfers.  Without limitation, the Debtor did not receive a reasonably equivalent value for any of the Avoidable

Transfers, which resulted in substantially all of the Debtor's assets being syphoned off and the Estate being left with millions of dollars in unpaid claims and other liabilities.

116.     There is a direct relationship between the enrichment of the Defendants and the impoverishment of the Debtor's Estate, as the Avoidable Transfers were made directly from the Debtor's bank account to or for the benefit of Defendants.

117.     There is no justification at all for the Avoidable Transfers, which were the product of self-dealings, fraud, and/or other misconduct by the CEO and others, and the Avoidable Transfers are not supported by reasonably equivalent value.

118.     Accordingly, Plaintiff is entitled to a judgment against Defendants compelling them to disgorge and return the amounts by which they were unjustly enriched.

## RESERVATION OF RIGHTS

119.     During the course of this proceeding, Plaintiff may learn through discovery or otherwise of additional claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law.  Plaintiff reserves all rights to amend this original Complaint to, among other things, (i) modify of and/or revise to Defendants' names; (ii) add defendants; and/or (iii) add claims or causes of action, if applicable (collectively, the "Amendments"), that may become known to Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the filing of this original Complaint.

## CONCLUSION

WHEREFORE, Plaintiff Alfred T. Giuliano, solely in his capacity as the Chapter 7 Trustee of the Estate of Alpha Media Group, Inc., demands judgment in his favor and against each of the Defendants, as follows:

a.   The entry of a judgment in favor of Plaintiff and against each of the Defendants avoiding and recovering the Avoidable Transfers, in an amount to be determined at trial;

b.   The entry of a judgment in favor of Plaintiff and against each of the Defendants to the extent that they were unjustly enriched at the expense of the Debtor;

c.   An award of reasonable attorneys' fees and costs;

d.   An award of pre- and post-judgment interest; and

e.   Such additional relief as this Court deems just and equitable.

Dated: June 23, 2025                    CHIPMAN BROWN CICERO & COLE, LLP

                                        */s/ Bryan J. Hall*
                                        David W. Carickhoff (No. 3715)
                                        Bryan J. Hall (No. 6285)
                                        Aaron J. Bach (No. 7364)
                                        1313 N. Market Street, Suite 5400
                                        Wilmington, Delaware 19801
                                        (302) 295-0191
                                        (302) 295-0199 (fax)
                                        carickhoff@chipmanbrown.com
                                        hall@chipmanbrown.com
                                        bach@chipmanbrown.com

                                        *Counsel for the Plaintiff Chapter 7 Trustee*